May it please the court. My name is Yolanda Barrera. I'm counsel for appellant Juan Bautista Castro-Cabrera. There are two issues in this case. The first is, of course, the motion to dismiss the indictment, and whether the district court erred in denying the dismissal of the indictment because the appellant, Juan Castro-Cabrera, had obtained his United States citizenship by virtue of his mother's United States citizenship. The second issue, and I would like to address both of them, is whether or not the district court erred in precluding the appellant from presenting a defense at the trial relating to his argument that he was a United States citizen by virtue of his mother's citizenship. As to the first issue, it is a constitutional issue to be free from unlawful imprisonment. As to the second, I did submit some additional supplemental authorities regarding the court having denied Mr. Castro-Cabrera the right to present evidence of United States citizenship, and in addition, denied him the right to present a defense which the jury could have used to determine whether or not he was an alien in the case. The facts at the trial were, I'm sorry, at the hearings, were largely contested by the government. It was not just a disagreement with respect to the case law that applied. It was not simply disagreement with respect to the effect of some of the actions that were taken, but there was largely a, the government largely contested everything, including the facts. Our position, to be clear, is our position today is the same position that we took in the district court, and that is that Mrs. Cabrera, my client's mother, had been a, was a United States citizen. She had lived in the United States, was born in Santa Paula, and at least three, that she had lived in the United States for at least three years. We believe that there was evidence she had lived in the United States for a longer period of time, but at least three, when she was three years old, the family moved to Mexico. She married a Mexican citizen without having obtained permission from the Department of Ministry in Mexico. Now, you want us to make sure we follow Mexican law on that, but you don't want us to follow Mexican law that would say that when you have an annulment that the children are not born out of wedlock. There was... It seems to me one of both ways. Well, two things. One is there is case law that says that if there is an annulment in another country that we do at least look at the annulment and the purpose for which it was granted. An annulment after both people are deceased. Yes. So it's the children bringing the action. That's correct. However, my first point... Only part of the family knows about it, right? Well, that's not really correct, Your Honor. That is what the government assumed from what was presented in the information to the court, and obviously I had no control over what information was presented by the Mexican court, but I know that that was not correct, that the family, the entire family was aware of it. However, going back to the original question of Your Honor, there was a disagreement between the experts with respect to what effect the annulment had on the children. The government's expert, Mr. Martinez, was of the opinion that regardless of the annulment, that Mexican law protected the issue, the children, and regardless of whether there was a divorce, dissolution, or an annulment, that nevertheless the children would still be considered legitimate children. The expert did not say born within wedlock, but that Mexican law would consider them as legitimate children. You don't want to create bastards under the law. And our argument is that they were considered legitimate children exactly for what Your Honor just said, and that is for patrimony and for purposes of inheritance, and that Mexican law was attempting to protect children for the mistakes of the parents, and that if it turned out that a couple ended up in a divorce, that there would not be allegations that the children were illegitimate, or if there was an annulment for whatever reason, that the children would still be protected with respect to their patrimony, with respect to their inheritance, their name, receiving money in a will, for example, or child support, but that that issue does not go to whether or not the formalities of the marriage had been followed. And in this case, the procedures set out in Mexico for a marriage are very, very solemn contractual obligations, and one of those requirements was that someone who was not a Mexican citizen must request permission from the government to marry a noncitizen, something that was not done. Our expert, Pablo Silva, opined that because of that, that was something that could not be cured. The fact that my client's mother had not requested that permission created a situation where there was no marriage to begin with. The other point I wanted to make about the question that Your Honor asked is, we're jumping ahead to the annulment, and I can understand why the court did that, because the government's almost entire argument in their brief relates to the annulment, but really we have two issues with respect to the citizenship issue. The government largely ignores the first point, and the first point is, let's put aside the annulment altogether. Let's assume that that had never existed. In other words, that that procedure in Mexico, which was after the fact, had never happened, that the attorney in Mexico was not hired, there was no rendering of an annulment order. That's an argument that the government largely ignored in their appellee's brief. Our position was that my client was a citizen on both, not just the annulment. In fact, we did not rely on the annulment. Our position was that because my client's mother had not requested the permission to marry, that made the marriage void. By making that marriage void, it placed him in a situation where he was out of wedlock. Whether or not the Mexican court ever declared it null and void was irrelevant. The seeking to have the annulment on our behalf was just a confirmation of what we already knew, and that is that the marriage was void. So the government largely argues with respect to what effect the annulment order had on the case. I stress that there is a preliminary argument that the government has ignored, and I believe that on that preliminary argument we win, and that is that he was already a citizen as a result of his mother's mistake. Whether or not there was an annulment is irrelevant. Now, the government argues... Judge Gould, if I could ask you a question, please. Yes. So, I mean, your client asserts mother made a mistake. Mother didn't ask for permission to marry the Mexican citizen, and I understand that. But what's the significance of the fact that all this is being raised more than 50 years after the marriage, you know, after the mother and the father have both passed away, so they can't testify? We have a marriage application that said that she is a Mexican citizen, which I saw your brief argue, so that shows you argue she didn't ask for permission. But what if that document were a fake document? Now, we don't just deal with Mexico in immigration. We deal with countries all around the world, and it seems to me there's at least a significant issue whether in interpreting 1409 out of wedlock we can look at retroactive changes in family status based on determinations made after the key actors are dead. I'd like your perspective on that. Yes. Certainly, it would have been helpful for this process to have been done before, and again, I'd like to preface that by saying that that is not my primary argument. That is a question with respect, again, to the annulment, and my position is even if we had not proceeded in seeking the annulment, we would still have the issue of my client's citizenship. But more directly answering your Honor's question is who would have been testifying at this proceeding in Mexico? The way that court presented it, the only ones who could have testified would have been what would be the registrar in the United States, the court clerk who made the mistake. That was the person who received notice as to whether or not he or she had followed the procedures and demanded some kind of documentation from my client's mother with respect to her citizenship, and that is the person that did not show up at this proceeding, so it was not contested in the sense that there were no witnesses against the annulment. Had the mother and the father still been alive when this procedure was initiated, there is a question whether they would have even been able to testify at this proceeding because the question was whether or not his mother, my client's mother, had followed the procedures, and if she had, then there would have to be documentation in the Department of Ministry, and there wasn't. Okay. If there are no further questions, you've more than used your time. Thank you. Good morning. May it please the Court. Margaret Carter on behalf of the United States of America in this case. The district court correctly denied the motion to dismiss because based on the facts that the defendant proffered, he was not a child born out of wedlock for purposes of Section 1409C, neither because of the purported defect in the marriage nor because of the 2009 posthumous annulment. And I'd like to address briefly this point about whether the issue is the defect or the annulment itself. I would submit that it doesn't matter, either under Mexican law or under United States law, and if anything, it would have been an easier question if there had been no Mexican annulment. First of all, taking United States immigration cases. Magana, Camera, both deal specifically with this question of void versus voidable, and this argument of that it's the defect, not the retroactive annulment, that matters. And both courts rejected those arguments and said that we should basically treat these as the same. That's also what the circuit courts have done, both in the Garcia and the Hendricks cases. In Garcia, it dealt with an issue that would have made the marriage void, an issue very similar to the one here, a failure to get parental permission to marry. It's hard, that's, we can see as an objective type of a failure, much like the failure to get the permit that is alleged in this case. The Hendricks case dealt with an alleged coercion of the person, of the immigrant who was then seeking later to annul the marriage. That dealt with the case in a grounds for an annulment that would not have been that petitioner's fault. But even if it wasn't the fault of that person because she was coerced into the marriage at the time, the Hendricks court still said that we could not, that for purposes of U.S. immigration law, the person was married at the time of her entry into the United States. It's equally clear under Mexican law that if there had been no annulment, this would have been an easy case. Because Articles 253 and 353 of the Sinaloa Civil Code both say that you need a final judgment, either to annul a marriage, it's presumed valid if not annulled, or to change the status of children from being born within wedlock. So in order to change either of those two kind of operative issues, you need a final judgment of a court. It can't, we can't just be focused on this purported defect that's never been litigated. Your position with respect to the annulment is what? My position is that the result is the same, whether we focus on the purported defect in the marriage or whether the annulment should relate back. And if anything, if there had been no annulment, as defense counsel has kind of urged that we think about it, that would have been an easier case under both, under certainly Mexican law. But there was. Indeed. And I think therefore the question of whether to relate that annulment back does become important. However, I think that the answer is clear that it should not get relation back. And it should not make this defendant born out of wedlock either under Mexican law or under United States immigration law. And for purposes of Mexican law, the operative provision is Article 345 of the Sinaloa Civil Code, which explicitly addresses the situation and says that children of an annulled marriage are still considered children born within marriage. I would submit that the language of the statute is very clear, as is the structure of the code, because there's entire chapters separate and apart that deal with the status of children that are separate and apart from the chapter that deals with annulment of marriages. So I would submit that the code tells us all we need to know. But I'd also submit that there's no real disagreement between the experts on what these code provisions mean. The government's expert, Adrian Martinez, says that the presumptions in the Sinaloa Civil Code regarding children born within marriage have no exception. That's the same thing that the Mexican attorney hired by the defendant to secure the annulment said. And that's Attorney Lugo de Montoya. In his question and answers solicited by defense counsel, he makes very clear and says repeatedly that this annulment has no effect on the status of the children as children born within marriage, that there are no exceptions to the presumptions. Okay. Can I ask you a question? This case, I'm just trying to understand the significance of this case, because it has a certain Alice in Wonderland quality to it. We're talking about the statute that was in effect in 1964 when he was born. Is that correct? Yes. And so what is the law now? Well, there are a couple of operative provisions. First of all, there is Section 1401, which deals with the standard for acquired citizenship for children born within wedlock. And then there is Section 1409, which deals with the standard for children born out of wedlock. For children born within wedlock, 1401, which the government submits is the operative standard. I think it's important that the government was not seeking in this case to preclude any acquired citizenship defense. We just wanted the right standard. That has been loosened. It was loosened in 1986. Prior to 1986, which is the law that applies to this defendant, a defendant with one United States citizen parent had to both show that that parent was a citizen and also that that parent resided in the United States for a total of 10 years, five of which were after that parent turned 14 years old. That standard, that 10-in-5 standard, as the government refers to it, has been loosened now to require only a total of five years of residency, two of which were after the citizen parent's 14th birthday. So the standard now is looser, but the law is very clear that we apply the law as it existed at the time of the defendant's birth. Right. So we'd have a different result if he had been born after? After 1986. I think it would certainly be debatable. And this was a highly contested issue at the first trial. The government concedes that the defendant's mother was present in the United States until age three, until 1933 when school records show that she and her family returned to Mexico. So I think it would have been debatable, but certainly it would have been much easier for a defendant to raise his defense and create a reasonable doubt about alienage if he only had to deal with the 5-in-2 standard. Okay. So under this regime of what the operative law is, I think it's very clear that the right standard for this defendant, based on all of the facts that the defendant himself proffered, is the 1401 standard that applies to children born within wedlock. And for that reason, the district court did not err in denying the motion to dismiss, nor did it err in precluding evidence and argument regarding the irrelevant 1409C standard. And again, I think the government wants to emphasize that although there were factual disputes here, the court analyzed this issue taking all of the defendant's factual proffers as true. Now, the problem was that the defendant made a bunch of legal proffers also, and legal arguments that were based on an erroneous interpretation of the term out of wedlock. And the government submits that that is certainly a legal question, that the court was entitled to evaluate and determine what the proper law was with regard to that standard. And then it was within the court's purview to determine whether any of the proper factual evidence was legally relevant. And I submit that the court correctly determined, first, that the evidence and argument was not legally relevant, and second, that even if there was some marginal probative value to the evidence, that it was properly excluded under Federal Rule of Evidence 403. And I think that that's, this is all true post the recent cases, Sandoval, Gonzales, Margue Pilato, and Espinoza-Baza that were cited in the party's 28J letters. And I think Espinoza-Baza is probably the one that most, it was certainly the one that directly addresses the Rule 403 issue. And it makes clear that even if there is some legal relevance, trial court judge has discretion to weigh the Rule 403 factors and determine that evidence is just too attenuated from the legal requirements of the defense. And it is, therefore, any probative value is outweighed by the substantial probability of jury confusion. You've used your time. Thank you. Any further questions? Thank you. Are there any further questions of the petitioner? The appellant, right? I have none. Yeah, all right. The case just argued is submitted for decision, and we'll hear the next case, which is United States v. Souders.
judges: McCuskey, Schroeder, Gould